# IN THE DISTRICT COURT OF THE UNITED STATES
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| UNITED STATES OF AMERICA, EX REL. | CASE **1:20 CV 1234** |
| | JUDGE **JUDGE BARKER** |
| ANGELA PAOLELLA ALSHABANI<br>6689 Broadview Road<br>Seven Hills, Ohio 44131, | **MAG. JUDGE RUIZ**<br>CIVIL COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIM ACT (FCA) AND HEALTH CARE FRAUD. |
| and | |
| ELVIRA MIHALKO<br>3325 Lucerne Avenue<br>Parma, Ohio 44134, | 31 U.S.C. §§ 3729-3733<br><br>**FILED**<br>**JUN 03 2020**<br>CLERK, U.S. DISTRICT COURT<br>NORTHERN DISTRICT OF OHIO<br>CLEVELAND |
| and | JURY DEMAND ENDORSED HEREIN |
| JASMINE ALSHABANI<br>6689 Broadview Road<br>Seven Hills, Ohio 44131, | FILED UNDER SEAL AND IN CAMERA |
| and | |
| DEAN ALSHABANI<br>6689 Broadview Road<br>Seven Hills, Ohio 44131, | |
| Relators,<br>v. | |
| MYOCARE NURSING HOME<br>4401 West 150th Street<br>Cleveland, Ohio 44135, | |
| and | |

| | )
|---|---|
| WESTPARK HEALTHCARE | ) |
| d/b/a Westpark Neurology | ) |
| and Rehabilitation Center | ) |
| 4401 West 150th Street | ) |
| Cleveland, Ohio 44135, | ) |
| | ) |
| and | ) |
| | ) |
| CRESTMONT NORTH | ) |
| 13330 Detroit Avenue | ) |
| Lakewood, Ohio 44107, | ) |
| | ) |
| and | ) |
| | ) |
| BHP MANAGEMENT | ) |
| CORPORATION | ) |
| 24340 Sperry Drive | ) |
| Westlake, Ohio 44145, | ) |
| | ) |
| and | ) |
| | ) |
| ELIAS COURY, | ) |
| 24340 Sperry Drive | ) |
| Westlake, Ohio 44145, | ) |
| | ) |
| Respondents. | ) |

## BACKGROUND INFORMATION

1. "CMS," The Center for Medicare / Medicaid Services is the agency responsible for implementing the Medicare/Medicaid programs under the Department of Health and

2. Health care providers who lawfully provide services to Medicare/Medicaid eligible patients are paid with taxpayer funds under the joint federal and state programs are obligated to comply with all laws for reimbursement and retention of federal reimbursement funds.

3. The Medicare program is authorized by 42 U.S.C. 1395, et seq. Reimbursement occurs between the United States Government, CMS, and private health insurance intermediaries to pay "Part A" claims or through carriers to pay "Part B" claims. The intermediaries and carries are, in essence, agents of CMS.

4. Medicare programs, although implemented by the state governments, are in fact funded by the United States Government. If any health care provider knowingly submits a false/fraudulent claim for medical services which is paid for, even in part, by the United States Government, it constitutes a fraudulent claim under the False Claims Act.

5. Relator has personal knowledge that Respondents have falsely presented claims for payment by the United States Government for patients receiving Medicare who were seeking legitimate eye care, but in fact received many tests and procedures which were medical unnecessarily for the sole purpose to generate excessive billing and false reimbursement from Medicare and/or insurers. Relator has personal knowledge that these fraudulent policies were created and implemented by Respondents.

## JURISDICTION AND PARTIES

6. Relator Angela Paoletta Alshabani (Angela) is a United States citizen who lives in Cuyahoga County, Ohio.

7. Relator Elvira Mihalko (Elvira), the sister of Angela, is a United States citizen who lives in Cuyahoga County, Ohio.

8. Relator Jasmine Alshabani (Jasmine), is a United State citizen who lives in Cuyahoga County, Ohio and is an adult child of Relator Angela.

9. Relator Dean Alshabani (Dean), is a United State citizen who lives in Cuyahoga County, Ohio and is an adult child of Relator Angela.

10. Respondent Myocare Nursing Home (MNH) is an Ohio corporation registered with the Ohio Secretary of State, in and providing health care services to Medicare/Medicaid patients in Cuyahoga County, Ohio.

11. Respondent Westpark Healthcare (WPH) is a health care provider located in and providing health care services to Medicare/Medicaid patients in Cuyahoga County, Ohio in a 100 bed capacity.

12. Respondent Crestmont North (CN) is a health care business located in and providing health care services to Medicare/Medicaid patients in Cuyahoga County, Ohio in a 100 bed capacity.

13. Respondent BHP Management Corporation (BHP) is a business entity incorporated in Cuyahoga County, Ohio and is the parent corporation which owns two skilled nursing facilities: Respondent WPH and Respondent CN of Lakewood, Ohio.

14. Respondent BHP management has financial control of, and receiving financial benefit from, any improperly received taxpayer funds due to health care fraud by its skilled nursing facilities in Cuyahoga County, Ohio.

15. Respondent Elias Coury (Coury) is listed at the incorporator of WPH and is also listed as the Chief Executive Officer of MNH, WPH, and BHP Management Corporation, and other health care companies, "Accuscripts Pharmacy" and "Pharmed Corporation."

16. Respondent Coury is believed to the owner, operator, and Chief Executive Officer of Respondent BHP, Respondent CN, and Respondent WPH.

17. Relators have evidence to suggest Coury is directly involved with the nursing home Respondents as Relators have a copy of a check written on behalf of Antonio from "Myocare Nursing Home" to "Westpark" to transfer a small amount of money, $724.04, from Antonio's social security funds, to Myocare, to WPH.

18. Venue in this Court is proper pursuant to 31 U.S.C. § 3732(a).

19. As this controversy involves allegations of violations of the False Claims Act and other federal statutory claims, this Court has federal question jurisdiction pursuant to 31 U.S.C. § 3729-3733 and 42 U.S.C. § 1320a-7b.

20. The allegations contained in this complaint occurred within six years of filing, placing it within the applicable statute of limitations.

# FACTUAL ALLEGATIONS

21. Relators assert Respondents MNH and WPH have falsely submitted claims for Medicare/Medicaid reimbursement for worthless services, substandard care, and committed neglect of elderly patients in their facility.

22. Relator Angela's and Elvira's father, Antonio Paolella (Antonio), was elderly and transferred from another medical facility to Respondent WPH's business in 2015. Antonio was born in 1936 and a beneficiary of Medicare.

23. Angela and Elvira had lost contact with their father for many years after his medical condition declined.

24. In March of 2018, Angela and Elvira located their father and after reuniting with him, both daughters began regular visits with him.

25. Elvira became a frequent visitor at Respondent's WPH location; Angela visited on average of once or twice a day. Angela also brought her children with her to visit Antonio. Relator Dean and Relator Jasmine were regular visitors with Angela.

26. Elvira regularly visited her father at the WPH facility and observed the lack of hygienic conditions and medical disregard of patients there.

27. Elvira repeatedly smelled an odor of human waste/feces/urine in the hallways of the WPH facility.

28. Elvira observed food lying on the floor in the dining hall and noticed an odor of human waste in the dining hall.

29. Elvira worried that nurses rarely responded to the "call button." Elvira discovered that the call button was not plugged in and was non-functional.

30. Elvira informed staff about the broken call button, but the staff was not interested in discussing it, an employee of WPH responded, that's "how it's always been."

31. Elvira attempted to turn on the air conditioning unit in her father Antonio's room, but noticed there was mold on and inside the unit. Angela was also disturbed by the odor of mold, urine, and feces.

32. Antonia's room contained a bed and a recliner chair; Elvira frequently found her father asleep in the recliner instead of the bed. Elvia asked a nurse "Dora," about this and Dora explained that staff usually allowed Antonio to sleep in the recliner overnight to save them the trouble of helping him get into bed.

33. Angela was told that medical orders were to keep Antonio's legs elevated as much as possible when he was sleeping, hence allowing him to sleep all night in a chair was against medical advice.

34. Angela observed that Antonio's legs were swollen; when she asked staff about his legs, they explained Antonio needed to keep his legs elevated, but this did not happen since he was often allowed to sleep in the reclining chair instead of a bed. Elvira further noticed that the recliner was broken and the legs would not raise at all.

35. Angela complained to staff because Antonio's clothes and shoes often had feces or urine on them, but staff made no corrective action.

36. Angela and Elvira would often take his soiled shoes and socks to their home to clean them.

37. Relator Jasmine saw and smelled mold and feces in Antonio's room and urine and feces in the hallways of the facility. Jasmine was concerned that the facility was cold and dark.

38. Jasmine noticed that her grandfather Antonio seemed to be more alert and happier the times he was transferred to Fairview Hospital then during his tenures at WPH.

39. Jasmine and Dean watched Respondents's administrators constantly give reasons to Angela why Antonio could not be discharged, as if Respondents was intentionally trying to keep Antonio from leaving.

40. Angela once noticed bruises on Antonio's face and shoulders, staff claimed that he fell after "tripping on a sock."

41. Elvira believed her father was afraid of staff. Antonio told Elvira that they should not "bother" the staff with problems and upset them. Antonio implied that staff might get angry and hit him.

42. Elvira did not believe the bruises she saw on her father's face and shoulders were consistent with a fall, but seemed more like the result of an assault.

43. Frequently, Angela and Elvira saw their father's feet were dirty and his toenails were unusually long; however, a review of some of the medical records falsely claim his toenails were trimmed on a regular basis.

44. Angela and Elvira would wash Antonio's feet and trim his toenails since the staff never did.

45. Dean watched Angela frequently clean Antonio's shoes, feet, and toenails.

46. Angela and Elvira saw the father with unusually long hair that was neither cut nor washed on a regular basis.

47. Angela and Elvira often shaved their father because his face was unshaved and unkept. Elvira bought a shaving kit and left it with her father, but her father said the nursing assistants did not want to help him shave.

48. Relator saw her father had an abdominal distension with no explanation from Respondents as to how or why this occurred. Relators could not obtain any diagnosis, reasoning, or plan for treatment from Respondents.

49. Elvira worried that her father's mental condition declined after Respondents began giving him anti-psychotic drugs such as Haldol and Lutuda. Elvia did not understand why her father would be given such drugs.

50. Antonio could go to the bathroom on his own, until he was prescribed anti-psychotic drugs, he declined and was no longer able to use the bathroom on his own.

51. Elvira noticed pills hidden around Antonio's room, hidden in food, hidden in coffee pots. Elvira believed staff may have simply put pills in Antonio's food and beverages to medicate him without him or family realizing it. Elvira once noticed pills inside Antonio's pudding.

52. Relator Dean and Elvira noticed that Antonio's clothes, shoes, and perfume were often missing or stolen.

53. Elvira purchased adult diapers to put on Antonio since the staff failed to keep Antonio clean from feces and urine.

54. Relator Dean was disturbed by the odor of feces in Antonio's room, the hallway, and lobby.

55. Angela made considerable efforts to get all medical records and billing records, but she was only able to obtain a small portion of records she found in his room; Angela never obtained most records due to obstruction from staff and administrators working at WPH facility.

56. Angela wrote letters asking for all medical records, but her request was ignored.

57. Angela sent a letter on November 18, 2019 to "Katherine Phillips," at Respondent WPH's address asking for copies of all billing records, but Angela received no response.

58. Angela asked numerous questions and made frequently complaints to Tiffany Cole-Hall who worked for WPH with the title: Director of Social Services.

59. In 2018, Angela notified the Ohio Attorney General's Office about substandard care from Respondents, but they took no action.

60. Angela asked an administrator if she could see her father's medical and billing records and the administrator said if they provided records to Angela, then she would become financially responsible for all future medical bills. The administrator's lie attempted to discourage family members from obtaining information about billing and medical services.

61. Angela met another patient in Respondents's facility named "Myra." Myra was a Hispanic woman who told Angela she had been in an automobile accident. Angela frequently heard Myra scream in pain without any response from medical staff.

62. One day Myra whispered in Angela's ear that this "was not a very good place."

63. Angela also met a patient at named "Wayne." Wayne was a roommate with Antonio and both men shared the same room.

64. Angela noticed that Wayne was often covered in urine.

65. Dean noticed that Wayne's clothes smelled awful and seemed to be wet.

66. Angela often heard Wayne scream in pain and have fits of anger; when Angela grew concerned and asked staff why Wayne's screams were being ignored, staff told Angela to "mind her own business."

67. Angela saw progress notes and medical records in her father's room stating Antonio could not speak, but Antonio frequently spoke with Angela and Elvira. Angela was concerned about false information in the documents claiming Antonio was mute.

68. Although the progress notes stating Antonio could not speak are false, if true the medical records would contradict billing records showing that Respondents provided speech therapy to Antonio.

69. Additional, Angela spoke with her father during his time in Respondent WPH's facility in both English and Italian. All medical records generated by WPH or submitted to the federal government by WPH asserting Antonio could not speak were false medical records.

70. Respondent WPH's medical records falsely reported that Antonio was mute, yet he spoke with his two daughters on a regular basis. Relator and her father conversed regularly in both English and Italian.

71. Relator Angela called a relative in Italy so her father could talk to him on the telephone.

72. Respondents falsely claimed Antonio could not speak with a purpose of repeatedly submitting false claims for Medicare reimbursement for speech therapy.

73. Angela found billing records for non-existent and unnecessary speech therapy that allegedly occurred on multiple days in 2017: October 12, 13, 16, 17, 18, 19, 21, 23, 24, 25, 26, and 30.

74. Relator also has billing records for Respondent Myocare and Respondent WPH falsely claiming speech therapy occurred on November 1, 2017, November 2, 2017, November 3, 2017.

75. Additional false billing was likely submitted for reimbursement of speech therapy but Relators could not obtain all billing records despite their repeated efforts.

76. Respondents created false medical records asserting Relator's father was mute allowed Respondents to falsely bill the federal government for speech therapy that was neither needed nor performed.

77. Angela inquired why Respondents believed Antonio needed regular swallowing tests since he could not eat solid food; however, she did not receive any coherent answer.

78. Angela saw her father eat solid food and Angela saw Antonio eat and swallow pizza in front of staff.

79. Dean often watched Antonio eat cookies, cake, sandwiches, and hot dogs, in contradiction of the medical records claiming Antonio could not swallow. All medical records generated by WPH or submitted to the federal government by WPH asserting Antonio could not swallow were false medical records.

80. Relators obtained partial billing records showing that false claims were submitted for non-existent and unnecessary swallow testing on the following days of May 2018: 16, 17, 18, 21, 22, 23, 24, 27, 29, and 30.

81. Additional false billing was likely submitted for reimbursement of swallow testing, but Relators could not obtain all billing records despite their repeated efforts.

82. Angela reviewed the partial billing records she obtained and noticed Respondents billed for swallowing tests and speech therapy that was never performed.

83. When Angela asked if Antonio could be discharged to her care, WPH's administrators said Antonio had to remain in the facility since he was immobile, but Angela responded that he had a walker and that he did walk with the walker with assistance.

84. Relator's father routinely walked all over Respondents's facility, which was known and obvious to all staff.

85. Despite being told their medical information was false, Respondents continued to insist that Relator's father was not ambulatory. Relator asked about discharging her father so he could live with her, but Respondents said he could not be discharged since he was unable to walk.

86. Relator informed Respondents that her father walked frequently, sometimes with a walker, but usually he walked quickly without any assistance or assistive device.

87. Antonio could walk but sometimes he used a walker, but didn't need a walker most of the time, Antonio walked all over the facility, often without assistance.

88. All medical records generated by WPH or submitted to the federal government by WPH asserting Antonio could not walk were false medical records.

89. Respondent WPH's head nurse "Karen" told Angela it would be a mistake to remove Antonio from WPH's facility.

90. Angela repeatedly asked employees, staff, administrators of Respondents about discharging her father out of the facility and into Relator's home, but they habitually discouraged Angela from removing Antonio from the facility.

91. Angela found her father's physician, Doctor Bashwra, at Fairview Hospital. Angela informed Dr. Bashwra that she believed her father was receiving poor medical care at Respondents's location.

92. Dr. Bashwra told Angela that he could not express an opinion about whether or not Antonio was receiving substandard care, even though he was the

doctor attending to Antonio at WPH's facility, however he suggested that Angela transfer her father out of West Park.

93. Angela and Elvira eventually insisted that their father be transferred to Parmadale. After Antonio was transferred to Parmadale, Angela asked Parmadale if she could review the medical file Respondents sent over.

94. Angela spoke with Sherry Rivera and Amber Childress of Parmadale, and they told her that Antonio's file consisted of a single page and all other records were never sent by Respondents.

95. Antonio passed away on September 11, 2018.

96. Relators repeatedly complained to agents, employees, staff, and medical personal employed by WPH, BHP, MNH, and Coury about substandard care, medical neglect, filthy living conditions, and false medical records yet not one individual employed by Respondents took any corrective action, showing that these problems are widespread throughout all of Respondents employees and facilities.

## COUNT I – MAKING FALSE CLAIMS, 31 U.S.C. § 3729.

97. Relators realleges lines 1-96 as if fully re-written here.

98. Respondent WPH has knowingly created, maintained, and presented false medical records with a purpose of obtaining funds from Medicare or Medicaid in violation of 31 U.S.C. §§ 3729-3733 known as the False Claims Act. (FCA)

99. Respondent WPH has knowingly submitted false records to CMS for reimbursement and knowingly sought reimbursement for alleged medical services that were known to be either non-existent services or worthless services at the time of requesting taxpayer funds from CMS.

100. The documents obtained by, and the personal observations of all four Relators demonstrates that Respondents engaged in a pattern of fraudulent behavior over a long period of time. Relators made numerous complaints to multiple employees, staff, nurses, and administrators of Respondents between 2015 and 2018.

101. Relators have actual knowledge that Respondents provided substandard care to Antonio and other patients while knowingly creating and submitting false billing records to the federal government for reimbursement causing harm to both patients and the federal government.

102. Based on the personal observations of Relators and the limited documentary evidence they have obtained, it is likely that the routine use of false medical records for to fraudulently bill CMS for Medicare/Medicaid reimbursement and tolerance of sub-standard care, is due to policy throughout all of Respondent Coury's skilled nursing facilities: Respondent WPH and Respondent CN.

103. As a recipient of federal health care funds for skilled nursing, Respondents are required to provide services within the standard of care to ensure sufficient medical services and to provide an acceptable quality of life pursuant to, inter alia, 42 U.S.C. 1396r.

104. Any Respondent who has knowingly billed the federal government for substandard, worthless, or non-existent medical services is liable under the FCA.

## COUNT II - FAILURE TO REPAY IMPROPER REIMBURSEMENT, 31 U.S.C § 3729.

105. Relator re-alleges lines 1-104 as if fully re-written here.

106. Respondents have failed to reimburse the monies they have knowingly retained in violation of Medicare guidelines within a 60 day window, they have failed to repay Medicare funds wrongfully received in violation of 31 U.S.C § 3729(a)(1)(G) of the False Claim Act, 42 U.S.C § 1320a, and section 6402(a) of the Affordable Care Act.

107. Respondents have failed to repay Medicare funds that have been identified as wrongfully reimbursed and therefore requiring a financial penalty of $5,500.00 to $11,000.00 per violation, not including modification by the Federal Civil Penalties Inflation Adjustment Act, under a theory of a "reverse false claim" as well as other financial penalties and remedies authorized by federal statute.

# COUNT III - CREATING, MAINTAINING, AND SUBMITTING FALSE DOCUMENTS AND HEALTH CARE RECORDS, 31 U.S.C § 3729.

108. Relator re-alleges lines 1-107 as if fully re-written here.

109. Respondents WPH, by and through its agents, employees, and/or medical staff have knowingly created, maintained, and submitted false records with a purpose to withhold monies from the United States Government.

110. Respondents knowingly provided sub-standard, low-quality, and unhygienic facilities and health care that it routinely constituted worthless services, but billed the federal government for these services through false representation to Medicare with a purpose of illegally receiving, pecuniary benefit to Respondent WPH and derivative financial benefit to Respondent BHP and Respondent Coury.

**WHEREFORE**, Relators seek the following remedies on behalf of themselves, the taxpayers, and the government of the United States of America:

111. Civil penalties pursuant to 31 U.S.C. § 3729 for the entire statute of limitation period allowed under the applicable statute of limitations of an amount between $5,500.00 and $11,000.00 for each violation committed by the Respondents.

112. Relators seek the maximum award allowable under 31 U.S.C. § 3730(d), of thirty percent to fifteen percent of any funds recovered for the fraudulent schemes of Respondents.

113. Treble damages for all financial losses incurred by the federal government and civil monetary penalties of a base amount $15,000.00 to $11,000.00, with adjustment by the Federal Civil Penalties Inflation Adjustment Act, for each violation of 42 U.S.C. § 1395nn.

114. Relators seek reimbursement for all costs of this action and reasonable attorney fees as authorized by the FCA, 31 U.S.C. § 3730(d) et seq.

115. Relator also asks this Honorable Court for any other remedy necessary to effectuate a just result.

Respectfully submitted,

LAW OFFICE OF DONALD GALLICK, LLC

_____
DONALD GALLICK (#0073421)
COUNSEL FOR RELATORS
190 North Union Street
Akron, Ohio 44304
(330) 631-6892
donaldgallick@gmail.com

## JURY DEMAND

Plaintiff demands a jury trial consisting of the maximum number of jurors allowable under the Federal Rules of Civil Procedure to determine liability, damages, and all facts and other triable issues in the instant controversy.

_____
DONALD GALLICK (#0073421)
COUNSEL FOR RELATORS